## *In re* MULL'S ESTATE.

*(Surrogate's Court, New York County. January 9, 1889.)*

EXECUTORS—ACCOUNTING—PROBATE PRACTICE—REHEARING.
   Code Civil Proc. N. Y. § 2481, subd. 6, authorizing a surrogate to open, vacate, or modify his decree, or to grant a new hearing for fraud, newly-discovered evidence, or other sufficient cause, does not entitle a party to relief from the consequences of his own neglect, and therefore a new hearing will not be allowed an accounting executor who has been at all times during the pendency of the proceedings apprised of the claims made against him, and of the issues of the case, and who has not been diligent in the preparation of his evidence.

On motion for rehearing.

For former opinion, see 2 N. Y. Supp. 23.

*A. J. Perry*, for George B. Lawton, executor. *Jas. H. Whitlegge*, for certain legatees.

RANSOM, S. Unusual indulgence has been given the accounting party in this proceeding. The record from first to last clearly shows that the contestant claimed the accounting party to be largely in debt to the estate on account of the copartnership between himself and the decedent. At the outset this position was made manifest, and the opinion of my predecessor, filed July 27, 1885, puts an end to any contention to the contrary. He distinctly held that the copartnership was not dissolved until the date of decedent's death, "and that between the partners there never was any final adjustment." In February, 1886, Judge ROLLINS again found that a copartnership had existed between the decedent and the accounting party, and such finding was not only never questioned by the accounting party, but, on the contrary, was admitted by him, because about that time he made a motion for an order revoking his letters upon allegations that "he has interests as surviving partner of the decedent antagonistic to his duties as executor, necessitating resort to another tribunal, where the estate should be represented by a disinterested person." This application was rightly denied by Judge ROLLINS, on the ground that "this court has ample authority to hear and determine the question of the executor's liability to the estate as surviving partner of the testatrix." Thus a second time, in unmistakable terms, the accounting party was informed by a clear decision of the court of his liability to account for any funds or property of the copartnership which had come to his hands as surviving partner. Thereafter the accounting party, acquiescing in this view of his duties and liabilities, appeared before the referee, (Mr. Strong,) and gave such evidence as he was advised upon the following subjects, precisely stated in the order of reference as follows: (1) to take and state an account of all the partnership transactions between the decedent and the executor prior to the decedent's death; (2) to ascertain and report what amount of money the executor has paid to the legatees; (3) to ascertain and report what amount of money or property belonging to the copartnership had been appropriated by the executor prior to decedent's death, and what loans, if any, the accounting party had at any time made from such partnership fund during the continuance of the partnership; (4) to ascertain and report what steps, if any, had been taken by the executor to recover decedent's share in the estate of Maria L. Mull, deceased; (5) to ascertain and report whether the decedent during her life-time delivered to Jennie Allire her promissory note for $1,541, and, if so, the circumstances of such delivery, and the extent of the payments thereon, if any payments thereon had been made; (6) to ascertain and report the proper and reasonable charge for professional services rendered the estate by A. J. Perry, Esq., aside from services rendered upon this accounting: (7) to ascertain and report what balance of funds belonging to decedent's estate have from time to time been in the hands of the executor, and what balance he now has; (8) to ascertain and report the sum for which the business of the firm in the hay and grain line was sold to Mull, Banks & Co., and to discover whether the relations of the executor in respect thereto were such as to render him liable in any wise for negligence or misconduct; (9) to ascertain and report what sums, if any, had been paid by the executor for the care and management of certain leasehold property and real estate specified in such order of reference; (10) to receive any testimony that might be offered by the executor relating to a claim made by him personally against the estate, and also in regard to a certain credit claimed by the executor for a rebate on certain life insurance policy collected by him. This order of reference was made in December, 1885, but proceedings were not

commenced until a long time thereafter, probably owing to the efforts of the accounting party to procure his letters to be revoked. Finally, after numerous hearings before the referee his report was filed, and substantially confirmed by the court on a careful review of all the evidence given by the accounting party and other parties concerned.

The referee found that certain real estate and leasehold interests, to-wit: The Dykman estate property, Thirteenth avenue, between Bethune and Bank streets, (Thirteenth-Avenue property,) West Eleventh street and Thirteenth avenue and Bulk-Head, (384, 385, and 386 West street,) 382 and 383 West Eleventh street, 427, 428, and 429 West and West Eleventh street, formerly Hammond street, 421 West street, 422 West street, (Gansevoort-Street property,) "were assets of said partnership undisposed of at decedent's death." This finding of the referee was excepted to by the accounting party, but was sustained by the court. Here, again, was sharp notice to the executor of his liability to account for these properties. Such account would, of course, or should, show debit and credit. And subsequent action by him before the same referee shows that he and his counsel fully apprehended the point of the finding and of the decision, and of the exact scope of the inquiry to be made. The executor must have known that he was held chargeable with these properties, and all rents, issues, and profits thereof, and that it was then incumbent upon him to establish, if possible, his contention as to values, and as to any and all credits he might be entitled to. At this point it was the duty of this executor to have prepared and laid in evidence his account. He did not do so, but seems to have been insensible of this obligation on his part. He produced, under notice, books, etc., which had been so imperfectly kept that great difficulty was found in making up the partnership account. The burden of all this labor should not have been cast upon the beneficiaries of this estate. Such expert aid as seemed imperative should have been employed by the executor, at his personal expense, to make plain to the court and its referee the true condition of the account. But on his consent—at least without objection—the referee was authorized to employ to aid him an expert accountant, and this gentleman, after much careful examination of a confused jumble of books and papers produced by the executor, reached a conclusion which was adopted by the referee in his elaborate report as the true state of the account of the copartnership and of the sum due from the accounting party to the estate. On the filing of the referee's report there was annexed by the referee, as a part of the report, an account of the partnership transactions prior to decedent's death. To this account the accounting party and contestant filed exceptions.

Judge ROLLINS, as stated by him in his opinion, was unable to decide the question on the evidence as it then stood. He said: "As these books appeared to have been kept in a somewhat confused fashion, the referee was authorized by the surrogate—the parties hereto not opposing—to employ an expert accountant to assist him in stating the account. I am led to believe from an examination of Schedules A and B, annexed to the report, that the first of these schedules, and to a considerable extent the second, represent the conclusions drawn by the accountant from his examination of the books and accounts which are in evidence; but, for the reason that the referee needed the assistance of this expert in informing himself as to the interpretation of the books, like assistance is required by the court. * * * I find nothing in the evidence pointing to the method in which the entries taken from these books have been summarized in these various aggregates. If, after the books had been examined by the expert accountant, such accountant had been called as a witness before the referee, and had produced schedules similar to those attached to the report, and had testified that those schedules fairly presented the conclusions to be drawn from the books themselves, the parties in interest would have had opportunity to question the witness, to ascertain his

methods and processes, and thus to have put matters in such shape that they could be intelligently passed upon by the surrogate." Judge ROLLINS further says: "In the seventh clause of his report the referee finds that there was in the hands of the accounting executor on the day of the decedent's death the sum of $27,140.13 belonging to her estate; that between that day and December 31, 1883, he received and expended various sums set forth in the schedule marked "D;" and that, including said sum of $27,140.13, the executor had in his hands on December 31, 1883, a balance of $65,465.81. To this finding exceptions are taken, both by the executor and by the contestant. As I have already said with respect to the first finding, the testimony does not enable me to pass upon the correctness of this portion of the report. * * * It is impossible, in the present state of the testimony, to fix with precision upon any amount at all. * * * For the determination of the matters at issue upon which no decision is here announced, the case must go back to the referee." This decision of Judge ROLLINS was filed December 30, 1887. Subseqently all parties duly appeared before me on the settlement of the decree to be entered as directed by this decision. On the 16th of February, 1888, the decree was signed, and by the ninth paragraph thereof it is adjudged that the contestant's exception to the finding of the referee, Mr. Strong, that the executor had in his hands the sum of $65,465.81 belonging to the estate of his testator, be overruled. And by the concluding provisions of this decree it was adjudged and ordered "that it be and hereby is referred back to the said referee, Theron G. Strong, Esq., to examine and take the testimony of the said expert accountant as to the correctness of the said schedules A and D." On the 9th day of April, 1888, Mr. Strong filed his report as referee under an order in accordance with the decree above mentioned, and no exceptions to that report have been filed by the accounting party.

In view of the inability of Judge ROLLINS, stated by him in his opinion already referred to, "to fix with precision upon any amount at all" to be charged against the accounting party, this report of Mr. Strong, filed in April, 1888, is important. The fact that the accounting party was satisfied with the report—such being the legal inference because he filed no exception—is controlling, in my opinion, upon his rights to the rehearing now applied for, and defeats them. The third paragraph of Mr. Strong's April report is as follows: "*Third.* I further certify and report that Schedules A and B, annexed to the report filed June 6, 1887, embody the result of my own independent examination of the evidence, oral and documentary, offered upon former hearings, and I do find that the facts and computations stated therein are true." The fourth paragraph of this report is also important in this connection. It is as follows: "*Fourth.* With reference to the books and papers examined by said Sibley in making up said Schedules A and B, I further certify and report that the said Sibley had before him and examined under my direction all of the books and papers in evidence before me." In the face of these findings, which he has never excepted to, I granted the petitioner's application for a further hearing under my order referring it back to Mr. Strong, as directed by Judge ROLLINS, because of some conditions which Mr. Strong had imposed upon the accounting party. Mr. Strong being unable to give the case further attention on account of other important engagements, I referred it to Judge HALL in his stead. The proceedings before Judge HALL on the part of the accounting party have not impressed me in his favor. No attempt in a business-like way seems to have been made by him to induce the expert accountant to overhaul the details of his arduous labors when he assisted Mr. Strong. His memory could not serve him when put upon the witness stand in respect of the mass of *data* gathered by him and Mr. Strong, and from which they made up Schedules A and B, which were annexed to and formed a part of Mr. Strong's report. No one should be surprised at that. Indeed, I think the accounting party should have anticipated such a result, consider-

ing the lapse of time and the nature of the work done. I have no doubt that, if the accounting party had approached the expert accountant in a business way, he could have persuaded him, for a fair compensation, to have reviewed his former work, and refreshed his memory so as to have testified clearly and fully upon the points left in doubt, and which were clearly pointed out in the decree of February, 1888, and the order subsequent, referring it back to Mr. Strong.

This application is, in effect, to vacate every decree and order heretofore made in this proceeding, and quite independent of the restrictions to be found in the statute—section 2481 of the Code—under which the application is made, and to grant it would be violative of every known precedent. No adjudicated case is cited by the attorney for the petitioner upon any point involved. Indeed, he seems to have been unable to fortify his contention by reference to any authority whatever. Section 2481, subd. 6, provides that the surrogate, in the court or out of court, as the case requires, has power "to open, vacate, modify, * * * or to grant a new trial or a new hearing, for fraud, newly-discovered evidence, clerical error, or other sufficient cause." The power here given to the surrogate has been defined by the court of appeals in its construction of this section. *In re Tilden*, 98 N. Y. 434; *In re Hawley*, 100 N. Y. 206, 3 N. E. Rep. 68. It will be seen on once reading these cases that the surrogate shall not exercise the power except it be made to appear to him that some one or more of the causes specified in the section exists. In the application at bar no one of these specified causes does exist. The application is really to review previous decisions of this court. The court of appeals say in *Re Hawley, supra*, that "some excuse must be shown by a party why he has not availed himself of the right of review provided by the statutes, and the character of such excuse is described in section 2481. That section very clearly defines the nature and characteristics of the proof necessary to authorize a proceeding thereunder, and by its expressions of the circumstances under which such an application can be made very clearly implies that it cannot be successfully maintained upon other grounds." If it be said that because every court of record has an inherent power over its own records to modify, amend, and vacate them, independent of the special authority conferred by statute, and that therefore in this proceeding the surrogate may exercise that power, the answer is inevitable that a proper case has not been made out by the petitioner. His laches have been such that no valid reason in law can be given for granting the relief he prays for. The court "will not relieve a party from the consequences of mere ignorance, inadvertence, or neglect." Hil. New Trials, 521. The prayer of the petitioner must be denied, with costs.

Since the argument of this application, I have received a written communication from the contestant, written without the knowlege or consent of her attorney, to the effect that she is in very distressing circumstances,—in actual want. I have taken some pains to verify her statements, because, if I found them substantially true, as I have, some measure of relief to her pending any further hearing in this proceeding, which I might think just to grant, would be one of the conditions which it would be right, in my view, to impose upon the petitioner. The decree of this court undoubtedly show a large sum in the hands of the petitioner belonging to this woman, and I direct that as one of the conditions upon which an order will be granted by me referring it back to Judge HALL for the sole purpose of giving the petitioner a last opportunity to obtain the information from the expert accountant, Sibley, sought for under the first order to him, that the petitioner, within two days from the date of the entry of such order, pay to her or to her attorney, for her support and maintenance, the sum of $100. And further, such order shall be granted only upon the same terms and conditions as those set forth in the order of September 6, 1888, by which it was referred to Judge HALL, except that the proceedings before him as such referee shall be terminated, and his report taken

up and filed within 30 days after the date of the entry of the order of reference to him; and such order of reference must be presented for settlement, accompanied by the required stipulation on the part of the petitioner, within five days from the date of the filing by me of this opinion. Failing to comply with these conditions, the reports of Referee Strong are confirmed, and a final decree in the proceeding will be approved, charging the accounting party with the sum of $65,465.81.